Mabel HALL, Plaintiff,

v.

SOUTH CENTRAL CONNECTICUT RE-GIONAL WATER AUTHORITY and United Steel Workers of America, Local 12160, Defendants.

No. 3:96CV01493(GLG).

United States District Court, D. Connecticut.

Dec. 5, 1998.

Judy D. Rintoul, Rosenblatt, Rintoul & Rintoul, LLC, West Hartford, Connecticut, for plaintiff.

Hugh F. Murray, III, Constance E. Blackwood, Murtha, Cullina, Richter, and Pinney, LLC, Hartford, Connecticut, for defendant, South Central Connecticut Regional Water Authority.

## OPINION

GOETTEL, District Judge.

Defendant South Central Connecticut Regional Water Authority ("the Water Authority") has moved for summary judgment on all counts of plaintiff's employment discrimination complaint. The thrust of Water Authority's motion is that, even assuming that plaintiff's allegations are true, plaintiff has failed to allege any illegal discrimination occurring within the relevant limitations periods. Plaintiff, however, relies on a "continuing violation" theory to bring the otherwise time-barred conduct within the limitations periods.

Because our resolution of the legal issues is necessarily fact-dependent, we review the

1. The Union was originally named as a defendant in this action. Plaintiff, however, has dropped her claims against the Union.

2. The Water Authority states in its Memorandum in Support of its Motion for Summary Judgment:

underlying facts in detail. Of course, on a motion for summary judgment, these facts are presented in the light most favorable to the plaintiff, as the non-moving party, and all reasonable inferences are drawn in her favor. See McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir.1997).

## FACTS

The Water Authority is an independent authority created by the State of Connecticut to provide water and related services to South Central Connecticut. Plaintiff Mabel Hall, who is an African–American female, has been employed by the Water Authority since 1978 in various clerical positions. During her entire tenure at the Water Authority, plaintiff was represented by the Union, United Steel Workers of America, AFL—CIO, Local 12160.[1]

Initially, plaintiff worked in Customer Service as a Customer Accounting Representative. She testified that, during her first six years with the Water Authority, she did not experience any problems that she would attribute to her race or sex. (Pl.'s depo. at 25).

From 1984 through 1992, she worked as a Special Billing Clerk and was supervised by Mr. Jean Gaudet. Plaintiff complains that Mr. Gaudet treated her with disrespect. He repeatedly shook his finger in her face and yelled at her. On one occasion, he grabbed plaintiff's head and made her bow her head in agreement with him when he was asking a question. On several other occasions, he threw his gum wrappers on plaintiff's desk. He would also open her desk drawer in which she kept her personal belongings and prop his foot up on her desk. Plaintiff asserts that he treated other black female employees the same way, but he did not treat white employees in this manner. Plaintiff filed several grievances with the Union concerning Mr. Gaudet's behavior. As a result of her filing grievances, Mr. Gaudet's behavior initially improved, although it is unclear how long the improvement lasted.[2]

"After Ms. Hall filed a Union grievance as a result of her supervisor's conduct his behavior improved and he did not repeat most of the incidents that gave rise to Ms. Hall's com-

In approximately 1992, her job was changed to Customer Accounting Clerk. Plaintiff testified in her deposition that from 1992 to 1994, she had no communication with Mr. Gaudet, who was still her supervisor. When asked why, she responded that "[h]e just wouldn't communicate with me." She then testified:

Q: Did you attempt to communicate with him?

A: When I had to, when I had a problem.

Q: Were you able to do your job without much communication without Mr. Gaudet?

A: Yes.

(Pl.'s depo. at 63–64).

On March 31, 1994, plaintiff's position as Customer Accounting Clerk was eliminated because the Water Authority was automating her position. Plaintiff, however, observed that the duties were not eliminated but were distributed among her co-workers. (Pl.'s depo. at 66). She testified in her deposition that she believed that her position was eliminated by Mr. Gaudet because he did not want to work with a black woman. (Pl.'s depo. at 74). When asked whether there was anything else that led her to believe that her race and sex were factors in this decision, plaintiff responded: "No; just that he would retaliate against me because I was a black woman that he couldn't work with." (Pl.'s depo. at 74). Plaintiff filed a grievance with the Union regarding the elimination of her position. The grievance was never arbitrated, plaintiff's job was eliminated, and Union officials told plaintiff to find another job within the Water Authority. (Pl.'s depo. at 68).

Under the Collective Bargaining Agreement between the Authority and the Union, plaintiff was eligible to displace or "bump" any bargaining unit employee with less seniority than she had for any job within the Authority, so long as she was qualified for the job. (Pl.'s depo. at 68). Plaintiff could have "bumped" into a Customer Service position or a Collections position in departments in which she had experience, but these jobs would have paid less than what she was making. Consequently, she chose instead to investigate positions in other departments. (Pl.'s depo. at 70–71).

Plaintiff investigated four different position in the Water Authority, including the positions of Rover in the Distribution Department, Water Treatment Plant Helper, the Meter Department, and Lab Assistant Technician. These were positions that plaintiff thought she physically could perform, in light of an injury to her ankle that she had sustained in 1991.[3] (Pl.'s depo. at 73). Plaintiff was not qualified for the Laboratory position, which required a degree in chemistry. Because of the climbing required in the Meter Department position, she testified that her doctor felt she should not pursue this job because of her ankle. (Pl.'s depo. at 77).

As for the other two positions, plaintiff claims that she was discouraged from applying for the Water Treatment Plant Helper position because of her sex. She states that Gary Huntley, a supervisor, told her that the job was too heavy for her because there were large cylinders to handle and he did not think that she could handle it. (Pl.'s depo. at 77–79). Based upon the advice of her doctor, plaintiff did not apply for that job.

The last position she looked into was the Rover position in Distribution. She alleges that Ed Gorman, a supervisor in the Distribution Department, discouraged her from applying for this job by emphasizing the amount of heavy lifting required, although this did turn out to be an accurate representation. (Pl.'s depo. at 83). Another supervisor, Jim Flynn, however, told her that he thought she could do the job. (Pl.'s depo. at 81). The only allegedly false representation

---

plaints." Def. Mem. at 2. Plaintiff's deposition testimony is not that clear-cut. She stated:

Q. Did Mr. Gaudet's actions or attitude to you change in any way following the grievance?

A. Somewhat.

Q. Did it improve or did it deteriorate?

A. Improve and went back to worse.

Pl.'s depo. at 50–51.

3. Plaintiff twisted her ankle in the company parking lot in 1991. She testified that she did not miss any work because of this injury, but that she did receive worker's compensation payments. (Pl.'s depo. 72).

about the duties of this position was made by John Ripley, another supervisor, who took her on a tour of the field locations and pointed out a pit infested with spiders and crawling insects and told her that she would have to work in the pit as part of her job. (Pl.'s depo. at 125). Plaintiff states that, in fact, she was never required to work there and claims that he showed this to her just to intimidate her into not bidding on the job. (Pl.'s depo. at 125). Ultimately, however, she chose to bid for the Rover position.

Thus, on April 5, 1994, plaintiff became a Rover in the Water Authority's Distribution Department. She reported to Mr. Ripley, who in turn reported to Mr. Gorman. A Rover was, at that time, responsible for monitoring the wellfields and performing repairs and doing preventative maintenance at the pumping stations. For her 30–day training and probationary period, plaintiff was assigned to work with Robert Brown, who was also African–American. Plaintiff's training with Mr. Brown did not go very well. He did not like training her and told her that he was not getting paid to train her. (Pl.'s depo. at 99–100). She states that Mr. Brown treated her in a resentful, disrespectful manner. He yelled at her and snatched things from her. His work habits made it difficult for her to learn this new job. Plaintiff states that he would ask her about her menstrual period and called her a "bimbo" and "stupid woman." All-in-all, plaintiff's training with Mr. Brown was very stressful. (Pl.'s depo. at 105). These incidents occurred in April through June, 1994.

In 1995, plaintiff complained to Ernie Coppock, the Deputy Director of her department, about pornographic magazines that the male employees had left in the storage area of plaintiff's truck and at her work stations. After she complained, the magazines were removed.[4] On another occasion, plaintiff's supervisor, Mr. Ripley, told her that he had found his wife in bed with a black woman, a statement that the plaintiff construed as reflecting his negative attitude toward black women. (Pl.'s depo. at 146). This was the

only comment of a racial or sexual nature he ever made to plaintiff, and he never said anything else that plaintiff considered inappropriate. (Pl.'s depo. at 146). Plaintiff also complains of the abusive treatment by Mr. Ripley, including his yelling at her for a problem on the job she had reported, but not created. Plaintiff states that Mr. Ripley explained his behavior to her by saying that it was because of how women treated him. (Pl.'s depo. at 149).

Plaintiff successfully completed her training and remained in her position as Rover for nearly a year. In March, 1995, however, she was informed that her position was being abolished due to a reorganization of certain operations. According to Christopher Hebberd, Director of Operations and Engineering, the Water Authority determined that responsibility for treatment and regulation of water from the wellfields should be transferred from the Distribution Department to the Water Treatment Department, which was better equipped to handle the increasing responsibilities affecting the wellfields. This decision was made at the senior executive level, and none of plaintiff's supervisors was involved in this decision. As a result, one of the three Rover positions in the Distribution Department was eliminated, and, according to the Collective Bargaining Agreement with the Union, the person with the least seniority was the first to be laid off. (Pl.'s depo. at 152). Thus, the other two rovers with more seniority than plaintiff were not affected by this reorganization, and only plaintiff's position was eliminated.

Plaintiff, however, contends that her position was not eliminated. Instead, she claims that her duties were transferred to two white employees, Mr. Ripley and Bill Murphy. Plaintiff filed a grievance relating to the elimination of her job. The Water Authority and Union reached a settlement of plaintiff's grievance prior to arbitration, which gave the plaintiff certain privileges over and above her rights under the Collective Bargaining Agreement. Plaintiff, however, did not

---

4. It appears from plaintiff's deposition testimony that she was upset about these magazines not only because of their pornographic nature but also because one of the magazines slipped from

the back of the truck under the brake and almost caused plaintiff to have an accident. (Pl.'s depo. at 133–34).

agree with the settlement, and the Union settled the matter over her objection. (Pl.'s depo. at 182).

Plaintiff was then transferred to the position of Water Treatment Plant Operator's Helper on what she describes as the "most difficult, dangerous route of the two" in March, 1995. Her supervisor was Mr. Huntley, the individual with whom she had spoken in 1994 regarding the Helper's position. Plaintiff complains that her white, male co-worker, Bill Murphy, tampered with her equipment and tools. Plaintiff also complains of arbitrary work assignments,[5] being given the most undesirable days off, and discriminatory overtime [6] privileges given to white male employees. The Water Authority justifies the overtime disparities based upon a four-month leave of absence plaintiff took in 1997, and the fact the October 27, 1995 agreement between the Authority and the Union provided that plaintiff would not be assigned to work in the surface water treatment plants, except in an emergency, which limited the overtime she was able to work.[7]

On July 13, 1995, plaintiff filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). For purposes of the motion for summary judgment, the Water Authority has assumed that this charge was joint-filed with the Equal Employment Opportunity Commission ("EEOC"). The CHRO dismissed her charge on September 28, 1995. On November 13, 1995, plaintiff filed an amended charge with the EEOC. On August 5, 1996,[8] plaintiff filed the instant suit, alleging race discrimination in violation of Title VII and 42 U.S.C. § 1981, sex discrimination in violation of Title VII.

## DISCUSSION

### The Summary Judgment Standard

Summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if, based upon the evidence of record, a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In employment discrimination cases, the Second Circuit has cautioned that district courts "must be cautious about granting summary judgment to an employer when ... its intent is at issue," *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994), which, of course, is usually the case.

In this case, the plaintiff claims that she received less favorable assignments and less overtime than white males and that her position was eliminated because of her race and sex; that she was subjected to a sexually and racially hostile work environment; and that the Water Authority retaliated against her for complaining about the discrimination. More specifically, plaintiff has alleged that her employer, the Water Authority, discriminated against her on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and on the basis of her sex, in violation of Title VII. In her complaint, she alleges:

Since March, 1994,[9] and continuing to the present, the Water Authority, through

---

5. It is unclear whether plaintiff is claiming these assignments were discriminatory because of her race or sex, or just that they were "arbitrary."

6. The only evidence plaintiff has offered in support of this claim is a "sample" from the Water Authority's own documents dated 9/27/97, which shows that certain employees, whom plaintiff identifies as white males, had worked cumulative amounts of overtime ranging from 53 hours to 314 hours, whereas the plaintiff had worked only 14. Of course, this document relates to events that transpired after plaintiff's lawsuit was filed.

7. This agreement also provided that the plaintiff would be called first for all overtime in her current assignment at the groundwater facilities. The Water Authority also agreed to offer the plaintiff 24 hours of overtime opportunity to perform work not normally done on overtime.

8. The parties use a date of August 1, 1996. Although plaintiff's complaint is dated August 1, 1996, it was not filed with this Court until August 5, 1996.

9. As is apparent from our discussion of the facts, *supra,* this date is obviously incorrect and proba-

its agents and employees, discriminated and retaliated against the plaintiff in the following ways:

—the defendant eliminated the plaintiff's customer accounting position;

—the plaintiff's supervisor in customer accounting treated her with hostility and disrespect, including grabbing her head and throwing gum wrappers at her;

—the supervisors and/or employees in the distribution department tried to discourage and prevent the plaintiff from using her bumping rights to bump into the distribution department;

—the supervisor and employees in the distribution department treated her with hostility and disrespect, including calling her "bimbo," "you stupid woman," and other pejoratives; yelling at her, and threatening and intimidating her; using unwelcome profanity in her presence; displaying unwelcome sexually explicit pictures in her presence; attempting to prevent her from learning her job properly and well; expressing hostility toward African American females; giving the plaintiff the most difficult tasks; and engaging in other illegal conduct;

—under the ruse of reorganizing, the Water Authority eliminated the plaintiff's job in the distribution department;

—the defendant transferred the plaintiff to the treatment department, tried to reduce the plaintiff's job grade while keeping the plaintiff in the same job as she had done in the distribution department; and upgraded the males;

—the defendant gave males preferential treatment in the assignment of jobs and tasks;

—the defendant refused to give the plaintiff the overtime opportunities which are due to her;

—the defendant changed the plaintiff's scheduled days off and gave her more undesirable ones, and reneged on a promise to change her days off when she filed a complaint with the Connecticut Commis-

sion on Human Rights and Opportunities; and

—the defendant refused to abide by grievance settlements.

Pl.'s Compl. at ¶ 11.

The Water Authority contends that some of the incidents of which plaintiff complains are untimely, and, as to the incidents that are timely, the undisputed facts demonstrate that none of the conduct complained of constituted illegal discrimination. Plaintiff responds that the Water Authority's conduct amounted to a "continuous course of discriminatory and/or retaliatory conduct starting in approximately 1984 and continuing to the present," including disparities in the terms and conditions of employment between white males and plaintiff and physical and verbal hostilities by supervisors in more than one department. Plaintiff argues that the limitations period should be extended based upon the continuing violation exception. Alternatively, she asserts that, to the extent that some of the acts were not overtly sexist or racist, they were part of the retaliation plaintiff suffered from her earlier complaints of discrimination.

### The Applicable Limitations Periods

 Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local agency, within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e-5(e)(1); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). This requirement is analogous to a statute of limitations, in that discriminatory incidents not timely brought before the EEOC will be time-barred once the plaintiff files suit in district court. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998). The parties do not dispute that a 300–day limitations period applies to plaintiff's sex discrimination claims. Thus, because the plaintiff filed her charge with the CHRO on July 13, 1995, only those incidents

bly should have read "1984." For purposes of this motion, we have assumed this date was

1984.

of sex discrimination occurring on or after September 16, 1994, would be actionable.

In contrast to her Title VII claims, plaintiff's section 1981 claims for race discrimination are governed by a three-year statute of limitations. The Supreme Court has held that, because section 1981 does not itself contain a statute of limitations, federal courts must look to the most appropriate state statute of limitations, which in this case is Connecticut's general three-year statute of limitations applicable to tort actions. C.G.S.A. § 52–577; *Runyon v. McCrary*, 427 U.S. 160, 180, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Wrighten v. State of Connecticut Dept. of Children and Family*, No. 3:97CV00618(EBB), 1998 WL 182590, at *1 (D.Conn. Apr. 8, 1998); *Napoleon v. Xerox Corp.*, 671 F.Supp. 908, 911 (D.Conn.1987). This action · was filed on August 5, 1996. Therefore, the earliest date for any actionable claim of race discrimination is August 5, 1993.

### The Continuing Violation Exception

█ The continuing violation exception extends the limitations period for all claims of discriminatory acts committed under an ongoing policy or practice of discrimination, even if those acts, standing alone, would have been barred by the statute of limitations. *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997). If there is a continuing violation, the limitations period begins to run when the last discriminatory act took place. *Lightfoot*, 110 F.3d at 907. The Second Circuit, however, has emphasized that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or prac-

tice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994).

█ With the possible exception of the alleged discriminatory overtime, plaintiff does not allege that the discriminatory incidents of which she complains were the result of a "policy" of the employer. Instead, she claims that there was a continuous course of discrimination and/or retaliatory conduct. Under the "continuing violation" standard enunciated by the Second Circuit, we must determine whether there were related incidents of discrimination that the employer permitted to continue unremedied for so long as to amount to a discriminatory policy or practice.

Beginning with the incidents involving Mr. Gaudet while the plaintiff was employed in a clerical position and in Customer Service, there is nothing to link his hostility and disrespect toward plaintiff with the incidents that occurred after April, 1994, when plaintiff went to work in the field. The only allegations concerning Mr. Gaudet that would fall within the limitations period are those involving the elimination of plaintiff's job allegedly due to her race [10] and, possibly, his lack of communication with her when she served as a Customer Accounting Clerk, although it is unclear whether plaintiff is claiming this conduct was discriminatory.

As for the alleged sexually discriminatory comments made by supervisors in 1994 when plaintiff was looking for a new job to bid upon, these likewise were not part of any continuous practice on the part of the Water Authority nor were they related to any other incidents within the limitations period. Thus, these allegedly sexist comments fall outside the limitations period. Similarly, the sexist comments made by Robert Brown, plaintiff's co-worker, are not part of a continuing violation of any sort and are time-barred.

Additionally, we find no evidence that the Water Authority allowed the incidents of discrimination to go unremedied for so long as to amount to a discriminatory practice or policy. *See Van Zant*, 80 F.3d at 713. Ac-

---

**10.** To the extent plaintiff claims this was because of her sex, it would be time-barred.

cordingly, we hold that the continuing violation exception does not apply, and we confine our consideration of plaintiff's sex discrimination claims under Title VII to those acts that occurred on or after September 16, 1994, and plaintiff's race discrimination claims to those acts that occurred after August 5, 1993. *See Quinn, supra,* 159 F.3d 759, 764, 1998 WL 770704; *Annis,* 136 F.3d at 246.

### Plaintiff's Timely Allegations of Race and Sex Discrimination

The only incidents occurring after September 16, 1994, that could possibly be classified as sexual discrimination are:

1. Plaintiff's supervisor's statement that he once found his wife in bed with a black woman;

2. The abolition of her Rover position in the Distribution Department in 1995;

3. The disparities in overtime and work assignments between plaintiff and her male counterparts;

4. The pornography plaintiff found in her truck, which she reported to her supervisor; and

5. The discriminatory overtime and work assignments.

The only incidents occurring after August 5, 1993, which could possibly be classified as racial discrimination are the first three incidents noted above, as well as the abolition of her job in Customer Service in 1994 by Mr. Gaudet, which she asserts was racially motivated, as well as his disrespectful treatment of her, and the allegedly discriminatory overtime and work assignments.

The Water Authority maintains that none of these incidents rise to the level of actionable discrimination, whether under a theory of disparate treatment, retaliation or racial or sexual harassment. We consider each of these theories separately.

### Disparate Treatment and Retaliation

■ Making overtime or job assignments or subjecting an employee to layoffs based upon an employee's gender or race can constitute actionable discrimination under Title VII. *See Woodbury v. New York City Transit Authority,* 832 F.2d 764 (2d Cir.1987). To establish a *prima facie case* of gender-based or race-based discrimination, a plaintiff must show that she was treated less favorably than comparable male or non-minority employees in circumstances from which a gender-based or race-based motive could be inferred. *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997). Plaintiff also asserts that the Water Authority retaliated against her for filing grievances relating to the discriminatory treatment that she had received by her supervisors. In order to establish a *prima facie* case of retaliation, the plaintiff must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). The allocation of burdens of proof in a retaliation case follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.*

As an increasing number of courts in this circuit have done, we will assume for purposes of this motion that plaintiff has met her *prima facie* burden under *McDonnell Douglas* and will proceed to the ultimate issue of whether the Water Authority's proffered reasons for the elimination of plaintiff's position and the differentials in overtime and job assignments were "merely a pretext" for retaliation or discrimination. *See Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 488 (S.D.N.Y.1998) (citing cases that have bypassed the "much criticized minuet or burden shifting analysis of *McDonnell Douglas* "). In order for a plaintiff to prove that an employer's proffered reason is a pretext for discrimination, the plaintiff must show that the reason was false and that discrimination was the real reason. *Gallo,* 22 F.3d at 1225 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ The Water Authority asserts that plaintiff's position as a Rover was eliminated due to a restructuring that moved certain of the wellfield responsibilities from the Distribution Department to the Water Treatment

Department, which was better equipped to handle these increasing responsibilities. It asserts that this decision was made at an executive level, and that none of plaintiff's supervisors were involved. Plaintiff has offered no evidence to refute these claims. Moreover, plaintiff does not dispute the fact that the reason her Rover's position was eliminated, as opposed to one held by her white male co-workers, was due to the Collective Bargaining Agreement with her Union, which governed layoffs and required that they be based upon seniority. Because plaintiff had the least seniority, she was selected layoff. Plaintiff responds, in conclusory fashion, that retaliation was the real motive. There is simply no evidence to support this.

■ Similarly, with respect to the elimination of her Customer Accounting position (which may be considered only with respect to her race discrimination claim under section 1981, since her Title VII claims are time-barred), the Water Authority's proffered explanation for the elimination of this position was automation. Plaintiff has admitted that much of her work was in fact automated and that her remaining duties were distributed to the remaining employees. She has failed to produce any evidence tending to show that this legitimate, non-discriminatory reason was a pretext for race discrimination. Here, the employer's asserted reasons were not false, and there is no evidence to support plaintiff's hypothesis that discrimination was the real reason for the elimination of her positions. As the court stated in *Fierro, supra,* " 'a jury cannot infer discrimination from thin air.' " 13 F.Supp.2d at 489 (quoting *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998)). "In sum, this Court declines to allow plaintiff's mere incantation of intent to 'operate as a talisman to defeat an otherwise valid motion.' " *Id.* (quoting *Meiri v. Dacon,* 759 F.2d at 998).

■ With respect to job and overtime assignments, plaintiff has offered no proof that these were made in a discriminatory fashion other than a single summary sheet dated "9/27/97" [11] entitled "Weekending," which lists stations, names, and numbers, presumably hours worked on the weekends. From this single sheet we cannot hold that the Water Authority's proffered reason for the differential in overtime was a pretext for discrimination. The Authority explains the difference based on the agreement it reached with the Union, which limited plaintiff's availability to work overtime on certain jobs and, at least insofar as 1997 is concerned, based upon a leave of absence the plaintiff took that year.

Once the movant for summary judgment has provided evidence to support its motion, the burden is on the non-moving party to show that there are disputed material facts as to whether the proffered reasons are a pretext for discrimination. *See Fisher v. Vassar College,* 114 F.3d 1332, 1337 (2d Cir. 1997) (en banc), *cert. denied,* — U.S. —, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994). Thus, the plaintiff in this case cannot rest on mere allegations but must "offer 'concrete evidence from which a reasonable juror could return a verdict in [her] favor.' " *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505); *see also Quinn,* 159 F.3d at 767–68, n. 8 (holding that, if a defendant meets its burden of pointing to evidence of a nondiscriminatory reason for its actions, on a motion for summary judgment, a plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason a pretext for impermissible retaliation). Plaintiff has failed to produce evidence to support a rational finding that the Water Authority's reasons were false and that unlawful discrimination and/or retaliation was the true reason for the overtime assignments. *See Valenti v. Carten Controls Inc.,* No. Civ. 3:94CV1769 AHN, 1997 WL 766854, at *6 (D.Conn. Dec. 4.1997). After a careful review of the record, we conclude that the Water Authority's proffered justifications were not pretextual and

**11.** Indeed, this exhibit was apparently created after plaintiff filed her charge of discrimination and her complaint in this case.

that no reasonable jury could conclude otherwise. Accordingly, we grant summary judgment in defendant's favor on plaintiff's claims of disparate treatment and retaliation. We now turn to plaintiff's hostile environment claims.

### Hostile Environment

Under the Supreme Court's recent pronouncements in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, ——, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998), employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor. *See Quinn,* 159 F.3d 759, 767. This standard would apply to the first two alleged incidents involving plaintiff's supervisors, as well as the problems plaintiff experienced in Customer Accounting with Mr. Gaudet, and the elimination of her positions with the Water Authority.

 However, when a co-employee, as opposed to a supervisor, is alleged to have engaged in harassing activity, the employer generally will not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it. *Id.* (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir. 1995)). This latter standard would apply to the incident involving the pornography in plaintiff's work truck. Plaintiff has not alleged that the Water Authority either failed to provide a reasonable complaint procedure or that it knew of this harassment and failed to take any action. Indeed, according to her deposition testimony, after she complained to her supervisor, this problem was corrected. Accordingly, we do not find the incident involving the pornography magazines and plaintiff's co-workers to be actionable. *See Quinn,* 159 F.3d 759, 767.

 As to the remaining incidents of alleged harassment, the Water Authority maintains that these do not arise to the level of actionable harassment. Our determination in this regard turns on whether the alleged conduct amounts to "discriminatory intimidation, ridicule, and insult that is suffi-

ciently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotations omitted). This determination requires us to examine the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance. *Id.* at 21–22, 114 S.Ct. 367; *see also Tomka,* 66 F.3d at 1305 & n. 5. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher,* 524 U.S. at —— n. 1, 118 S.Ct. at 2283 n. 1. "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987)) (internal quotations and emphasis omitted). The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Thus, to prevail on a hostile work environment claim, the plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment. *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998); *Tomka,* 66 F.3d at 1305.

 Even when we accept as true all of plaintiff's allegations that are timely and attributable to her employer, as we are required to do on summary judgment, we conclude that the plaintiff has not produced sufficient evidence to support a finding that she was subjected to abuse of sufficient severity or pervasiveness so as to alter the

conditions of her employment. *Quinn*, 159 F.3d 759, 768. Accordingly, we grant the defendant's motion for summary judgment on plaintiff's hostile environment claims.

### CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment of the defendant Water Authority [**Doc. # 33**] is GRANTED in all respects.

SO ORDERED.